**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 03:08 PM February 18, 2014**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| THOMAS D ROLLER, | ) | CASE NO. 12-61145 |
| | ) | |
| Debtor. | ) | ADV. NO. 13-6050 |
| _____ | ) | |
| DANIEL M MCDERMOTT, | ) | JUDGE RUSS KENDIG |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OF OPINION (NOT** |
| THOMAS D ROLLER, | ) | **INTENDED FOR PUBLICATION)** |
| | ) | |
| Defendant. | ) | |
| | ) | |

On February 13, 2013, the United States Trustee ("Trustee") filed a complaint objecting to Thomas D. Roller's ("Debtor") bankruptcy discharge. Trustee argues that Debtor made false oaths within his bankruptcy petition in violation of 11 U.S.C. § 727(a)(4)(A), failed to adequately maintain records in violation of § 727(a)(3), and failed to satisfactorily explain his loss of assets in violation of § 727(a)(5). Debtor argues that he has not violated any portion of § 727(a) and therefore should be granted a bankruptcy discharge. The court held a trial on December 16, 2013, followed by the submission of post-trial briefs by both parties.

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on April 4, 2012. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core matter under 28 U.S.C. § 157(b)(2)(I).

1

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

I. Facts

At the start of 2011, Debtor was employed by First Federal Bank in Galion, Ohio ("First Federal") in accounting and information technology roles. Debtor worked at First Federal for over twenty-four years. Before Debtor's financial tailspin, eventually leading to Debtor's current bankruptcy, First Federal paid Debtor an annual salary of approximately $34,000.00. Debtor was able to save over $95,000.00 in two Edward Jones stock accounts as well as approximately $80,000.00 in two retirement accounts. However, from the start of 2011 up until Debtor's bankruptcy filing in early 2012, Debtor spent over $240,000.00 without acquiring any significant unencumbered assets.

The majority of Debtor's financial problems appear to coincide with his relationship with Holly Williamson. Williamson was a waitress at a restaurant in Bucyrus, Ohio, a town near Debtor's employment. Debtor met Williamson while she was working as a waitress, they started to talk often, and eventually became romantically involved. At the start of the relationship Williamson told Debtor she was divorced from her husband. As Debtor and Williamson's relationship grew more serious, Debtor began to spend money on Williamson's personal expenses, such as buying her groceries, dinners, paying for entertainment, and covering some of her living expenses. In one illustrative example, Debtor paid Williamson's $1,500.00 electricity bill in August of 2011. Tr.'s Ex. 19-11. After Debtor and Williamson knew each other for approximately one year, Williamson told Debtor that she was tired of being a waitress and wanted to open a restaurant. While Debtor had no experience running a restaurant, he did have the financial ability to purchase and outfit a restaurant. It was at this time that Debtor and Williamson purchased and began to renovate a restaurant they named "Someplace New." Debtor testified that he spent between $30,000.00 and $40,000.00 trying to open Someplace New. Debtor also testified that a robbery occurred at Someplace New in 2011, with burglars taking televisions, firearms, copper tubing, and other high-cost items. Debtor and Williamson never opened Someplace New.

In late 2011 Debtor was terminated by First Federal. While the exact details are uncertain, it is clear is that Debtor improperly handled $500.00 in bank assets. First Federal learned of Debtor's actions, terminated him and instituted criminal proceedings. Debtor retained an attorney and eventually pled guilty to a lesser charge. It was at this time that Debtor decided to end his relationship with Williamson and walk away from Someplace New. While Debtor was done with Someplace New, Williamson was not. She opened Someplace New in June of 2012 with her husband, the same man Williamson had told Debtor she was divorced from. In actuality, Williamson was married during the entirety of her relationship with Debtor. To hide her husband's true identity, Williamson told Debtor that her husband was her brother.

In light of his financial problems, Debtor voluntarily filed for chapter 7 bankruptcy protection on April 20, 2012. Debtor's bankruptcy petition ("Petition") listed him as unemployed with no source of income except for financial assistance from his parents. The Petition lists

secured claims of $18,390.52 and unsecured claims of $112,973.26. The Petition lists no interest in real property and only $24,525.00 in personal property ($22,250.00 of which is a Ford truck secured by a loan of $18,390.52). As noted below, Debtor's Petition is not entirely accurate.

### A. An Overview of Debtor's 2011 Spending

While Debtor lost his job at the end of 2011, Debtor's financial problems started well before his termination. From January to December of 2011, Debtor made credit card purchases of $81,175.00, obtained cash disbursements from his Edward Jones stock accounts of approximately $90,000.00, received a loan of $8,500.00 from his 401(k), received a loan from First Federal for $19,318.50, received a loan of $7,162.50 from Prosper.com,[1] and received a salary of $34,391.00 from First Federal. When Debtor filed his Petition he listed $0.00 in cash. Therefore, during 2011, Debtor had approximately $240,000.00 in new spending. Debtor also made payments on his credit cards totaling $56,125.00. Even assuming the high-end of Debtor's cost estimate for Someplace New, Debtor still had $200,000.00 in other spending in 2011. For a Debtor with an annual salary of $34,391.00, Debtor's 2011 spending is very unusual. After reviewing the Debtor's bank and credit card statements, the majority of Debtor's spending was associated with construction expenses (likely connected with Someplace New), food, household goods, entertainment, normal living expenses, and credit card payments. Trustee's bankruptcy analyst, Catherine Lowman, reached the same general conclusion. The majority of Debtor's purchases were placed on credit or debit cards, allowing the court to see the date, location, and amount of the transaction, providing some insight into Debtor's use of assets. However, Debtor also made a large number of cash withdrawals from his bank accounts (or failed to deposit cash receipts), which gives the court no indication of how the money was actually used.

### B. The Accuracy of Debtor's Bankruptcy Petition

When Debtor filed his Petition, he signed and declared under the penalty of perjury that all the statements in his Petition "are true and correct to the best of my knowledge, information and belief." Tr.'s Ex. 2-27. At Debtor's 341 meeting of creditors, Trustee asked Debtor "to the best of your knowledge, is all of the information [in your Petition] accurate and complete?" Tr.'s Ex. 17-3. Debtor answered "yes." Id. However, even though Debtor swore on multiple occasions that his bankruptcy schedules were accurate, Trustee believes that Debtor has made four separate untrue statements—three within his Statement of Financial Affairs ("SOFA") and one within Schedule B (which requires a debtor to list his interests in personal property). At trial, Debtor admitted that his answers to three questions in his Petition were false.

Question 2 of Debtor's SOFA asks if Debtor had income other than from employment or the operation of a business for the two years immediately preceding the commencement of his

---

[1] Prosper.com is an online peer-to-peer lending website. To obtain a loan on Prosper.com, a debtor enters the amount he wishes to borrow, the purpose of the borrowing, and information about his credit history. Individual members of the Prosper community then review the debtor's information and agree to fund a portion of the debtor's loan. For example, an individual member may fund $100.00 of a debtor's requested $4,000.00 loan. Once a debtor's loan is 100% funded by the Prosper community, the debtor receives the loan proceeds and begins making monthly payments to Prosper.com. Prosper.com then apportions a pro-rata share of each payment to the members of the Prosper community based on the amount of the member's loan to the debtor. See How It Works, Prosper, http://www.prosper.com/welcome/how-it-works/ (last visited Feb. 10, 2014).

bankruptcy case. Debtor answered "none," but admitted at trial that his answer was false. According to Debtor's 2011 federal income tax return, he received $29,384.00 in capital gains from the sale of stock. Debtor explains his error by stating that he viewed his stock accounts as savings account. Therefore, when he withdrew money it was not income, but was simply the withdrawal of money he had already earned.

Question 11 of Debtor's SOFA asks Debtor to "[l]ist all financial accounts and instruments held in the name of the debtor for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of the case." Debtor answered "none." Debtor admitted at trial that this his statement was false. When Debtor was terminated from First Federal, the bank closed three of Debtor's accounts—one checking and two savings. At trial, Debtor explained that he did not believe he needed to include the accounts because First Federal closed the accounts against his will, and he believed the question only required he list accounts voluntarily closed. Debtor admitted at trial that the question makes no distinction between who closed the accounts.

Part "d" of question 19 in Debtor's SOFA asks the Debtor to "[l]ist all financial institutions, creditors, and other parties . . . to whom a financial statement was issued by the debtor within two years immediately preceding the commencement of the case." Debtor answered "none." In March of 2011, which is within the relevant timeframe, Debtor obtained a $32,000.00 loan from First Federal. As part of the loan process, Debtor completed a credit application used by First Federal to analyze Debtor's creditworthiness. The loan document was titled "Credit Application" and asked questions pertaining to Debtor's employer, job title, salary, assets, and liabilities. At trial Debtor testified that he did not believe the Credit Application was a financial statement, especially because the words "financial statement" did not appear on the application.

Debtor's final false statement is on Schedule B, which requires a debtor to list his interests in personal property. Item 12 in schedule B asks the Debtor to disclose any interest in an IRA or other type of pension or profit sharing plan. Debtor answered "none." Debtor admitted at trial that his answer was false. In January of 2012 Debtor rolled over a retirement account previously held with First Federal to an Edward Jones IRA with a value of $33,316.77. Tr.'s Ex. 8-1. Additionally, on January 20, 2012, Debtor rolled over an additional retirement account from Great-West into an Edward Jones account with a value of $45,765.32. Tr.'s Ex. 8-2. Debtor claims that he did not disclose his interests in the IRA accounts because he thought the funds were exempt and therefore did not need to be disclosed. The court notes that Debtor's Schedule B lists his interests in household goods, clothing, and jewelry, even though the assets are completely exempt.

### C. The Completeness of Debtor's Financial Records

As noted above, Debtor received the following amounts in cash in 2011: $90,000.00 from loans taken against his Edward Jones stock accounts and cash disbursements from the sale of stocks from the same account (Tr.'s Ex. 7); $8,500.00 from a loan against his 401(k) (Tr.'s Ex. 19-10 to -11); $19,318.50 from a loan from First Federal (the loan was for $32,000.00, but $12,671.50 was used to pay off previously existing loans) (Tr.'s Ex.4); $7,162.00 from a loan

4

from Prosper.com (Tr.'s Ex. 6-20); and $34,391.00 from employment at First Federal (Tr.'s Ex. 3-1). During 2011 Debtor also made purchases on his credit cards of approximately $81,175.00 (Tr. Ex.'s 10, 12, 14) and made credit card payments totaling approximately $56,125.00 (Tr.'s Ex. 10, 12, 14). Therefore, in 2011, Debtor made approximately $240,000.00 in cash expenditures. For an individual with a salary of $34,000.00, Debtor's 2011 expenditures are extraordinarily large, especially considering Debtor's bankruptcy petition lists under $25,000.00 in assets, $22,500.00 of which is a Ford F-150 truck secured by a loan of $18,390.52. Tr.'s Ex. 2-9, -11.

At trial, Debtor explained that his 2011 expenditures were used primarily for three purposes: to open Someplace New; to pay down credit card bills; and for general living expenses. Debtor testified that he spent between $30,000.00–40,000.00 opening Someplace New. Even assuming that Debtor spent $40,000 on Someplace New, Debtor still spent approximately $200,000.00 in 2011 on general living expenses. In order to explain the purchases, Debtor provided bank statements, credit card statements, and receipts from cash purchases. Debtor did not maintain separate records of his personal and business expenses. While Debtor's records do provide some detail of his 2011 financial expenditures, the records do not provide a complete story. Based on testimony and the court's review of Debtor's First Federal checking account, Debtor made numerous unexplained cash withdrawals in 2011. Debtor also received unexplained cash advances on his credit cards totaling $6,125.00. When a debtor makes a cash withdrawal, the corresponding documentation simply lists the date, location, and amount of the withdrawal, information that does not give any indication of the use of the withdrawal. For example, a typical cash withdrawal in Debtor's bank statement says "1-10 CASH WITHDRAWAL AT MAIN OFFICE $500.00." Tr.'s Ex. 6-1. In contrast, a credit card statement showing a $500.00 purchase at Home Depot gives a much clearer view of the usage of the funds.

Debtor has been able to provide documentary evidence to support many of his cash withdrawals. Debtor's evidence, which Trustee summarized, indicates that Debtor made $27,569.00 in cash withdrawals during 2011. Tr.'s Ex. 15, 16. Debtor also provided documentary evidence, consisting mostly of receipts from cash purchases at various locations, explaining $14,281.18 in cash expenditures. Tr.'s Ex. 15, 16. Therefore, according to Debtor's information, $13,287.82 in cash withdrawals remains unexplained. While Trustee compiled the summary of Debtor's information, Trustee nevertheless contests the accuracy of the Debtor's underlying information. Specifically, Trustee's bankruptcy analyst notes that Debtor's cash withdrawal information shows $7,202.00 in cash withdrawals in September and October, but Debtor's First Federal checking account shows withdrawals for the same two months totaling $18,473.50. Trustee believes that Debtor's information significantly understates Debtor's cash withdrawals. Additionally, of the receipts Debtor provided, four receipts are for the purchase of money orders totaling $721.60. Similar to a cash withdrawal, a receipt showing the purchase of a money order does little to indicate how the money was actually spent. Debtor's information also contains an unsubstantiated $800.00 spent on a vacation. Debtor's largest "receipt," which Debtor testified relates to a $6,325.00 payment to the City of Galion, Ohio to hook up utilities at Someplace New, is nothing more than a print-out from a calculator with hand-written notes. At trial, Debtor provided what appears to be a Microsoft Excel spreadsheet listing the locations Debtor spent an additional $14,494.22 in cash.[2] Def.'s Ex. 1. Debtor does not provide any documentary support

---

[2] Debtor's Excel spreadsheet lists explanations for cash expenditures of $14,494.22, even though Debtor's cash

for these amounts, such as a receipt or invoice, even though the majority of the expenses are over $1,000.00. Def.'s Ex. 1.

The court conducted its own brief investigation of Debtor's 2011 First Federal checking account statements. Not including transfers between accounts, Debtor made approximately $32,500.00 in cash withdrawals during 2011—significantly more than the $27,569.00 Debtor calculates. Debtor's calculation also includes $8,991.00 in withdrawals from two savings accounts not included within evidence. Assuming Debtor's calculation of $8,991.00 is correct, and including the court's calculation of $32,500.00 in cash withdrawals from Debtor's First Federal checking account, Debtor made approximately $41,500.00 in cash withdrawals in 2011 from all of his bank accounts. Even if the court accepts every receipt provided by Debtor, which total $14,281.82, Debtor nevertheless has $27,218.18 in unexplained cash withdrawals. Additionally, at Debtor's 341 meeting of creditors, Debtor testified that he made an $11,000.00 deposit into a savings account in February of 2011, but by April of 2011 he had exhausted the funds almost entirely via cash withdrawals. Tr.'s Ex. 19-12. If Debtor's testimony is accurate, Debtor made larger cash withdrawals in two months from one of his savings accounts than Debtor's cash withdrawal information reported to Trustee for the entirety of 2011 for both savings accounts. The court also notes that Debtor took $6,125.00 in cash advances on his credit cards that the court has been unable to trace to Debtor's First Federal checking account.

To help explain Debtor's lack of cash withdrawal documentation, Debtor makes two assertions. First, Debtor testified that a significant amount of his cash withdrawals were turned into bank checks and used to pay creditors. The court has no documentation to support this position. At his 341 meeting, Debtor testified that he used bank checks because they are a more secure form of payment. Tr.'s Ex. 19-11. At trial, Debtor testified that he used bank checks to assure he would not overdraft his checking account. The court finds Debtor's testimony regarding bank checks not to be credible. Bank checks are not a more secure form of payment than writing personal checks for the payer. Additionally, a Debtor with accounting experience should not require the assistance of bank checks to prevent him from overdrafting his checking account. Debtor's significant change in justification between his 341 meeting and trial is similarly troubling. Debtor's brief also argues that Someplace New's business records were stolen in a robbery. Debtor testified that televisions, firearms, copper tubing, tools, and cash were stolen from Someplace New. Debtor was looking at a police report when making these statements. The court finds Debtor's testimony regarding the robbery to be credible. However, Debtor's testimony did not refer to any stolen business records and the police report was not admitted into evidence. The court is also wary to believe that burglars would steal business records, items which are heavy, hard to move, and are of little value to anyone other than the business owner.

## II. Law & Analysis

The United States Bankruptcy Code (the "Code") was designed to give a "fresh start to the honest but unfortunate debtor." <u>Marrama v. Citizens Bank of Mass.</u>, 549 U.S. 365, 367 (2007) (internal quotation marks omitted). However, the Code does not automatically grant all debtors a fresh start, as § 727(a) lists twelve exceptions that prohibit a debtor from receiving a

---

withdrawal information claims Debtor's total unexplained 2011 cash withdrawals are $13,287.82.

6

discharge. Exceptions to discharge "should be construed strictly against the creditor and liberally in favor of the debtor [while recognizing] that a discharge is bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." Sheehan & Assocs. PLC v. Lowe, 2012 WL 3079251, at *3 (E.D. Mich. 2012); See also Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000). The three exceptions relevant in the current case state that:

> (a) The court shall grant a debtor a discharge, unless– . . .
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
> (4) the debtor knowingly and fraudulently, in or in connection with the case--
> > (A) made a false oath or account; . . .
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . .

11 U.S.C. § 727(a)(3)–(5). The discharge limitations in § 727(a) encourage debtors to give complete and accurate information by "furnish[ing] creditors with a vehicle under which abusive debtor conduct can be dealt with by denial of discharge." Lunn Real Estate Invs. v. Ward (In re Ward), 2013 WL 5429767, at *2 (Bankr. E.D. Tenn. 2013) (internal quotation marks omitted); In re Keeney, 227 F.3d at 683.

When dealing with the denial of discharge under § 727(a), the burden of proof is initially placed on the party objecting to discharge. Fed. R. Bankr. P. 4005; Hunter v. Sowers (In re Sowers), 229 B.R. 151, 156 (Bankr. N.D. Ohio 1998). If the party objecting can put forward sufficient evidence to establish a prima facie case, the burden shifts to the debtor to provide evidence sufficient to rebut the objecting party's claim. In re Sowers, 229 B.R. at 156. "Nevertheless, it is always the party objecting to discharge who bears the ultimate burden of persuasion, to prove by a preponderance of the evidence, that all the statutory requirements have been met." Id.; In re Keeney, 227 F.3d at 683.

### A. Debtor's Discharge Is Denied Under § 727(a)(4)(A)

Under § 727(a)(4)(A), a debtor's discharge should be granted unless he "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." A violation of § 727(a)(4)(A) requires the objecting party to prove the following elements:

> (1) The debtor made a statement under oath;
> (2) the statement was false;
> (3) the debtor knew the statement was false;
> (4) the debtor made the statement with fraudulent intent; and
> (5) the statement related materially to the bankruptcy case

7

In re Keeny, 227 F.3d at 685. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations." U.S. Tr. v. Zhang (In re Zhang), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012). If the debtor decides to make a false statement, "[s]ection 727(a)(4)(A) ensures that [the debtor's] false, fraudulent statements . . . are not made without significant consequences." Coleman v. McLean (In re McLean), 2013 WL 5863718, at *3 (Bankr. E.D. Tenn. 2013) (internal quotation marks omitted).

For the purposes of § 727(a)(4)(A), a statement is made under oath when it is made in a bankruptcy petition or at a debtor's § 341 meeting of creditors. Ayers v. Babb (In re Babb), 358 B.R. 343, 355 (Bankr. E.D. Tenn. 2006). Either an affirmative false statement or an omission satisfies element two. In re McLean, 2013 WL 5863718, at *3. A statement is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property." Sheehan & Assocs., 2012 WL 3079251, at * 7. While certain matters may be so small as to be deemed immaterial, larger items represent a violation of § 727(a)(4)(A). Id. However, even when hidden assets are immaterial (or even worthless), if the false statement or omission *could* lead the court to the discovery of material property, discharge may be denied. Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992); Forrest v. Bressler (In re Bressler), 387 B.R. 446, 461 (Bankr. S.D.N.Y. 2008); Baron v. Klutchko (In re Klutchko), 338 B.R. 554, 568 (Bankr. S.D.N.Y. 2005) ("[O]mitted or incorrect information may be 'material' for purposes of section 727(a)(4)(A) even if ultimately the failure to disclose was not prejudicial to creditirs."). For example, in In re Beaubouef, a case cited favorably by the Sixth Circuit, the Fifth Circuit determined that discharge may be denied even when admittedly false statements related to a worthless business venture. Id. Holding otherwise gives the debtor the power to decide what information is and is not important to creditors. However, "[c]reditors are entitled to judge for themselves what will benefit, and what will prejudice, them." Id. (internal quotation marks omitted).

The most difficult question is often whether a statement is made with the requisite knowledge and fraudulent intent. Fraudulently and knowingly are two separate elements that should not be combined. In re McLean, 2013 WL 5863718, at *4. "Knowledge that a statement is false can be evidenced by a demonstration that the debtor knew the truth, but nonetheless failed to give the information or gave contradicting information." In re Babb, 358 B.R. at 355. Fraudulent intent "requires that the debtor . . . made or failed to make the statement with the intention of being fraudulent." In re Sowers, 229 B.R. at 159. Fraudulent intent can be shown by a debtor's material representations that the debtor knows are false or by "reckless disregard for the truth exhibited by continuing patterns of omissions and/or false statements." Id.; Keeney, 227 F.3d at 685; Abbey v. Retz (In re Retz), 364 B.R. 742, 754 (Bankr. D. Mont. 2007). "Fraudulent intent is not established if the false information resulted from a mistake or inadvertence" but "can be found based on the cumulative effect of a series of innocent mistakes which evidences a pattern of reckless and cavalier disregard for the truth." Sheehan & Assocs., 2012 WL 3079251, at *7. The Sixth Circuit summarized fraudulent intent as follows:

> [I]ntent to defraud involves a material representation that [the debtor] know[s] to be false, or, what amounts to the same thing, an

8

> omission that [the debtor] know[s] will create an erroneous
> impression. A reckless disregard as to whether a representation is
> true will also satisfy the intent requirement. Courts may deduce
> fraudulent intent from all the facts and circumstances of a case.
> However, a debtor is entitled to discharge if false information is
> the result of mistake or inadvertence.

In re Keeney, 227 F.3d at 685–86 (citations and internal quotation marks omitted). A debtor's intent can be inferred from circumstantial evidence, with a debtor's credibility and demeanor often being paramount. In re Babb, 358 B.R. at 355; 6 Collier on Bankruptcy, ¶ 727.04[1][a] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013). The court in In re Babb summarized § 727(a)(4)(A) as follows:

> Since interested parties should not be required to drag the truth
> from the debtor, a showing of good faith in a § 727(a)(4)(A) matter
> will often come down to whether a debtor has abided by this
> cardinal rule: when in doubt, disclose. For example, a debtor is
> likely to be forgiven for simply mislabeling an asset, where its
> existence is still initially disclosed. However, where a debtor only
> voluntarily discloses information after its existence is uncovered
> by a third-party (e.g., a trustee or creditor), good faith is unlikely to
> be found.

358 B.R. at 356.

### 1.     Debtor and Trustee's Arguments

Trustee argues that Debtor's inaccuracies in his Petition are sufficient to deny discharge under § 727(a)(4)(A). Debtor admitted at trial that he made three false statements: (1) failure to list income other than from salary or the operation of a business; (2) failure to list bank accounts closed within one year of bankruptcy; and (3) failure to list his interest in retirement accounts. Trustee believes Debtor systematically hid information with the intent of concealing his 2011 spending and his relationship with Williamson. For example, if Debtor had disclosed his closed First Federal checking account, Trustee would have learned of Debtor's large cash deposits and expenses, leading to additional questions. Similarly, if Debtor had disclosed his income from the sale of stock, Trustee would have investigated the use of the proceeds, again leading to the discovery of Debtor's 2011 spending. Trustee also believes Debtor lied on his Petition to appear as a low-income no-asset debtor whom Trustee would hopefully quickly skip over. Finally, Trustee argues that each of Debtor's proffered explanations for his false statements are not believable, especially in light of Debtor's twenty-four years of financial experience.

Debtor attempts to justify each of his false statements. Debtor's explanation for failing to report income from the sale of stock is that he believed his investment accounts were like "savings accounts." Therefore, Debtor argues, because he was simply withdrawing money that was already his, no income was generated. Debtor attempts to explain his failure to list bank accounts closed within one year of bankruptcy by stating that he thought the question only asked

9

about accounts he voluntarily closed, not accounts that were involuntarily closed by another party. Debtor's explanation for his failure to disclose his interest in retirement accounts is that he thought exempt property did not need to be disclosed. While not a justification for his false statements, Debtor also argues that because his false statements did not hide otherwise recoverable assets, and therefore creditors have not been harmed, discharge should not be denied. Essentially, a "no harm, no foul" defense.

### 2. Debtor's False Statements Satisfy All Elements of a Claim Under § 727(a)(4)(A)

The court finds that elements (1), (2), and (5) are satisfied. The debtor made false statements in his bankruptcy petition and at his 341 meeting of creditors, satisfying the under oath requirement. In re Babb, 358 B.R. at 355; In re Sowers, 229 B.R. at 158. Debtor admitted at trial that at least three of the statements in his Petition were false, satisfying the second requirement. Debtor's false statements are also material, as they "bear[] a relationship to the bankrupt's business transactions or estate, or concern[] the discovery of assets, business dealings or the *existence and disposition* of property." In re Keeney, 227 F.3d at 686 (internal quotation marks omitted) (emphasis added); McDermott v. Crespo (In re Crespo), 2014 WL 172302, at *5 (Bankr. N.D. Ohio 2014). Debtor's failure to list either his closed bank account or his income from the sale of stock relates to the disposition of property. Similarly, Debtor's failure to report his Edward Jones retirement accounts relates to the discovery of assets. While the assets are exempt, their inclusion would likely have altered the Trustee's initial view of the Debtor's finances. Furthermore, Debtor's false statements materially impacted the administration of Debtor's estate, leading Trustee to file the current adversary proceeding. In re Crespo, 2014 WL 172302, at *5. In Sheehan & Assocs., a debtor attempted to make the same "no harm, no foul" argument by noting that his false oaths did not adversely affect creditors, and therefore did not materially relate to his bankruptcy. 2012 WL 3079251, at *7. The court rejected the argument, stating that "the question is not whether the false oaths *affect* the administration of the Debtor's estate or discovery of assets, business dealings, or the existence and disposition of debtor's property, . . . but whether the false oaths *bear a relation* to these things." Id. Debtor's false statements bear a relation to the discovery and disposition of assets, as well as the administration of the bankruptcy estate, satisfying element five.

Elements (3) and (4) require more in-depth analysis. Element (3) requires that the Debtor "knew the statement was false." In other words, the element is satisfied if Debtor knew the correct answer to the question, but instead decided to give contradicting information. In re Babb, 358 B.R. at 355. The court finds the element satisfied. Debtor failed to list income from the sale of stock in his Petition. Debtor's 2011 income tax return, which Debtor signed on February 10, 2012, lists capital gains of $29,384.00. Debtor filed his bankruptcy petition on April 20, 2012, a little over two months later. The court finds it extremely unlikely that Debtor simply forgot about capital gains of $29,384.00. Debtor also failed to list his Edward Jones IRA accounts within Schedule B. Debtor executed two "rollover" documents with Edward Jones in January of 2012, approximately three months before bankruptcy. Again, the court finds it extremely unlikely that a debtor with an annual salary of $34,000.00 would simply forget about retirement accounts valued at over $80,000.00. Debtor also failed to list his First Federal checking account in his Petition. Debtor admitted at trial that he read the question wrong and made a mistake. While

inadvertent errors are normally not grounds for a denial of discharge, a pattern of errors, even innocent, can satisfy the knowledge requirement. Sheehan & Assocs., 2012 WL 3079251, at *7. The court finds that Debtor's three false statements are sufficient to satisfy element three.

      Fraudulent intent "requires that the debtor . . . made or failed to make the statement with the intention of being fraudulent." In re Sowers, 229 B.R. at 159. While actual intent is hard to prove, fraudulent intent can be inferred from the circumstances of the case. Id. The element is satisfied either by a debtor's material misrepresentations that the debtor knows are false or through "reckless disregard for the truth exhibited by continuing patterns of omissions and/or false statement." In re Babb, 358 B.R. at 355. The court believes Debtor made false statements with the required intent. Each of Debtor's omissions could have lead Trustee to discover Debtor's extremely unusual 2011 spending. In turn, Debtor would be required to explain his cash withdrawals, the attempted opening of Someplace New, and his relationship with Williamson. Debtor's knowledge of banking and accounting enforces this conclusion. See Job v. Calder (In re Calder), 907 F.2d 953 (10th Cir. 1990) (holding that a bankruptcy attorney's incorrect statements on his own bankruptcy filing were sufficient to infer fraudulent intent). The court believes Trustee has established a prima facie case establishing all five elements of § 727(a)(4)(A).

      The burden now shifts to Debtor to explain his admittedly false statements. Debtor's explanation that he viewed his Edward Jones stock account as a "savings account" is not convincing. Debtor spent twenty-four years working in the banking industry, at least a portion of which he was employed in an accounting capacity. Debtor also properly accounted for capital gains income on his 2011 tax return. Debtor's explanation that he did not list his Edward Jones IRA account because he thought the property was exempt is also not believable. First, Debtor included other exempt property within his Petition. Debtor's Schedule B lists household goods, wearing apparel, and jewelry, all of which Debtor claimed as completely exempt on Schedule C. Second, if Debtor truly believed the property was exempt, what reason would he have not to disclose it? The court believes Debtor did not include information on his Edward Jones retirement account in the hopes that Trustee would quickly pass over Debtor, viewing him as a debtor with low-income and low-assets. Debtor contends that his final false statement, that he did not list his First Federal bank accounts because they were involuntarily closed, was simply an oversight. While an innocent oversight should not deny discharge, a pattern of innocent oversights may be sufficient. Sheehan & Assocs., 2012 WL 3079251. Courts generally do not give much credence to an explanation premised on a debtor's clearly incorrect reading of an unambiguous question. See In re Beaubouef, 966 F.2d at 179 ("Such a straightforward question obviously calls for a direct answer, and cannot reasonably be interpreted as excluding [the type of business entity the debtor was involved with]"). If Debtor had listed his First Federal bank accounts, Trustee would have certainly discovered Debtor's 2011 spending. When evaluating Debtor's three admittedly false statements against Debtor's proffered explanations, the court is convinced that Trustee has proven, by a preponderance of the evidence, all of the elements of § 727(a)(4)(A).[3] Debtor's discharge will be denied.

---

[3] Because the court finds that Debtor's three admittedly false statements are sufficient to deny discharge, the court need not evaluate Trustee's claim that Debtor's failure to list a financial statement issued to First Federal.

## B. Debtor's Discharge is Denied Under § 727(a)(3)

Under § 727(a)(3), the court should deny a debtor's discharge if he "failed to keep any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case." The goal of the section is "to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of disclosure requisite to a discharge." Sheehan & Assocs., 2012 WL 3079251, at *3. The party seeking the denial of discharge, Trustee in the current case, need not show that the debtor acted with fraudulent intent, but does bear the initial burden of proving that the debtor's records are inadequate, therefore making it impossible to ascertain the debtor's financial condition and evaluate his material business transactions. Turoczy Bonding Co. v. Strbac (In re Strbac), 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999); First Nat'l Bank v. Grider (In re Grider), 453 B.R. 716, 722 (Bankr. W.D. Ky, 2011); Stephens v. Morrison (In re Morrison), 450 B.R. 734, 747 (Bankr. W.D. Tenn. 2011). However, Trustee is not entitled to perfect or complete information, but only "enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable time past to present." In re Strbac, 235 B.R. at 882 (internal quotation marks omitted).

The court has "wide discretion" when determining whether to deny discharge under § 727(a)(3). Dolin v. N. Petrochemical Co. (In re Dolin), 799 F.2d 252, 253 (6th Cir. 1986). Each decision is fact specific and should be made on a case-by-case basis. United States v. Trogdon (In re Trogdon), 111 B.R. 655, 658 (Bankr N.D. Ohio 1990). While a debtor's records do not need to be in any specific form, the records must be sufficient to enable a debtor's creditors to discover the debtor's personal and business transactions for a reasonable period of time. Mercantile Peninsula Bank v. French (In re French), 499 F.3d 345 (4th Cir. 2007). When determining if the debtor has provided sufficient records, the court should consider the debtor's "occupation, financial structure, education, experience, sophistication, and any other circumstance that should be considered in the interests of justice." In re Trogdon, 111 B.R. at 658; See also D.A.N. Joint Venture v. Cacioli (In re Cacioli), 285 B.R. 778, 783 (D. Conn. 2002).[4] Courts normally differentiate between consumer and business debtors, often finding that consumer debtors do not have a duty to keep records, instead finding that bank and credit card statements are enough. W. Ky. Prod. Credit Ass'n v. Brame (In re Brame), 23 B.R. 196 (Bankr. W.D. Ky. 1982). Courts require more in-depth record keeping by financially sophisticated debtors engaged in running a business, holding that "the failure to keep or produce any records regarding [business] transactions may be treated as a violation of § 727(a)(3)." In re Morrison, 450 B.R. at 747. However, some courts have excused a debtor's failure to provide adequate business records because the size or nature of the debtor's business does not lend itself to maintaining in-depth records. See Sheehan & Assocs., 2012 WL 3079251, at *5; see also In re Cacioli, 285 B.R. at 783. In summary, a court should only require a debtor "to take such steps as

---

[4] In re Cacioli lists the following factors: "1. whether the debtor is engaged in business, and if so, the complexity and volume of the business; 2. the amount of the debtor's obligations; 3. whether the debtor's failure to keep or preserve records was due to the debtor's fault; 4. the debtor's education, business experience and sophistication; 5. the customary business practices for record keeping in the debtor's type of business; 6. the degree of accuracy disclosed by the debtor's existing books and records; 7. the extent of any egregious conduct on the debtor's part; 8. the debtor's courtroom demeanor; and 9. any special circumstances that may exist." 285 B.R. at 783.

ordinary fair dealing and common caution dictate," with the goal of requiring a debtor to provide sufficient information to allow a creditor to learn how the debtor disposed of his estate. Koufman v. Sheinwald, 83 F.2d 977, 980 (1st Cir. 1936).

### 1. Trustee and Debtor Arguments

Trustee notes that Debtor spent approximately $240,000.00 in 2011, an abnormally large amount for a debtor with an annual salary of approximately $34,000. In order to explain his uses of cash, Debtor provided bank statements, credit card statements, and receipts from cash purchases. However, even after taking all Debtor's explanatory documents into account, Trustee believes Debtor has not sufficiently explained his use of assets. First, Debtor claims that he spent between $30,000.00 and $40,000.00 opening Someplace New, but Trustee states he does not have information substantiating "anywhere near these amounts." Additionally, Trustee's compilation of Debtor's cash withdrawal and expenditure information leaves $13,287.82 in unexplained cash withdrawals. However, both Trustee and the court note evidence suggesting the actual amount of unexplained cash withdrawals is substantially larger. Debtor counters by stating that he has produced over four-hundred pages of documents, which should be more than sufficient to grant him a discharge in the current case. Debtor also notes that he provided essentially all of the evidence in this case, and Trustee has received every piece of evidence requested that was within Debtor's possession. In summary, Debtor believes he maintained adequate records under the unusual circumstances of his case.

### 2. Debtor Did Not Provide Adequate Documentary Evidence of his Financial Transactions Under § 727(a)(3)

The focus under § 727(a)(3) is the adequacy of a debtor's records. In evaluating the adequacy of Debtor's records, the court first notes that complete bank and credit card statements are normally sufficient for individual debtors, absent a large and unusual dissipation of assets. See In re Juzwiak, 89 F.3d 424, 428 (7th Cir. 1996); Jahn v. Morgan (In re Morgan), 2011 WL 864963, at *6 (Bankr. E.D. Tenn. 2011); Travormina v. Resnick (In re Resnick), 4 B.R. 602 (Bankr. S.D. Fla. 1980). Debtor's spending of $240,000.00 in 2011 is sufficiently unusual to require more, especially considering that Debtor's spending was approximately seven times larger than his pre-tax salary. Additionally, courts hold financially sophisticated debtors to higher record keeping standards. Debtor's twenty-four year employment at a banking institution, at least some of which was in an accounting role, qualifies Debtor as sophisticated in financial matters.

Debtor provided his bank, credit card, and Edward Jones statements with information on his use of assets to Trustee. Debtor's bank and credit card statements generally provide the date, location, and amount of spending, giving creditors a general view of Debtor's financial picture. However, whenever Debtor made a cash withdrawal, the corresponding line item provides essentially no insight into how the cash was used. Gray v. Jackson (In re Jackson), 453 B.R. 789, 800 (Bankr. E.D. Pa. 2011). Assuming the court accepts Debtor's information pertaining to unexplained cash withdrawals, $13,287.82 remains unsubstantiated. When compared to Debtor's annual salary, Debtor had completely failed to account for approximately 39% of his pre-tax income. Additionally, in just one month, October of 2011, Debtor made the following cash withdrawals: $6,500.00; $1,860.00; $1,000.00; $550.00; $2,844.00; $500.00; and $1,250.00. Of

13

the October withdrawals, Debtor has only provided evidence to support a cash payment of $6,325.00 to the city of Galion, Ohio to set up utilities at Someplace New. Tr.'s Ex. 15-159. However, the "receipt" debtor provided is a copy of tape from a printing calculator with hand-made notations. While such information may be sufficient under certain circumstances, in light of Debtor's other omissions and mistakes, the court does not accept a calculator printout as sufficient evidence. Debtor attempts to explain his other October withdrawals, but his evidence is an excel spreadsheet with typed explanations. As Debtor's October withdrawal amounts are large, the court would expect Debtor to maintain at least some third party record of the transactions, such as an invoice or receipt. While a Debtor is not required to keep perfect records, the court believes that a reasonable debtor would maintain records of large cash withdrawals, especially a financially sophisticated debtor making large cash purchases for a business. The court in In re Trogdon reached a similar conclusion, holding that a debtor's failure to provide documentary evidence of cash withdrawals equal to 25% of his salary, as well as the debtor's failure to explain "substantial" individual cash expenses, "frustrates any attempt to determine [d]ebtor's financial history" and justifies denying a debtor's discharge. 111 B.R. at 659.

As noted above, credit card and bank statements are normally sufficient for individual debtors. However, highly unusual spending patterns may, in some instances, require additional records as well as specific and credible testimony. See In re Juzwiak, 89 F.3d at 428 ("Many courts faced with checking account records, canceled checks, deposit slips, bank statements, and tax returns as the sole documentation of a debtor's financial history and condition have determined that such records are inadequate under § 727(a)(3)."); see also Union Planters Bank N.A. v. Connors, 283 F.3d 896, 900 (7th Cir. 2002); Rossi v. Moreo (In re Moreo), 2009 WL 2929949, at *7 (Bankr. E.D.N.Y. 2009); Rosen's Inc. v. Ghere (In re Ghere), 393 B.R. 209, 220–21 (Bankr. W.D. Ma. 2008); PNC Bank, Nat'l Ass'n v. Buzzelli (In re Buzzelli), 246 B.R. 75, 102–05 (Bankr. W.D. Pa. 2000). The current case illustrates one such extraordinary situation. In January of 2011, Debtor made $3,402.68 in purchases at "Big Box" retail and grocery stores such as Wal-Mart, Meijer, and Kroger. Debtor also spent $931.27 in the same month eating at restaurants. Combined, Debtor spent $4,333.95 in one month at large retail stores and restaurants.[5] These spending amounts are extraordinarily large for a debtor with an annual income of $34,000.00. Additionally, Debtor incurred his January "Big Box" expenses over twenty-seven separate transactions, indicating that on an average day in January Debtor stopped at a large retail store and spent over $100.00. The court is convinced that Debtor's attempted opening of Someplace New cannot explain his January "Big Box" spending. While Debtor's spending at "Big Box" stores is unusual, his spending at gas stations is even more surprising. For example, in May of 2011, Debtor spent $1,182.36 at gas stations and gas station convenience stores. Outside of the exorbitantly large total, the transaction dates add to the confusion. Over the six day period from May 12 through May 17, Debtor made six separate gas station purchases totaling $368.49. Each of the transactions occurred in the same general area, reducing the possibility that Debtor traveled large distances and therefore needed to frequently refuel his vehicle. The court was also able to locate other examples of very out of the ordinary gas station spending. For example, in one day Debtor made four separate gas station purchases totaling $206.15 and over a three day span spent $404.23. Similarly, in March, April, and June of 2011 Debtor spent $1,548.78, $1,059.63 and $949.42 at gas stations and gas station convenience

---

[5] The large amount of money Debtor spent eating at restaurants convinces this court that Debtor's spending at "Big Box" stores cannot be sufficiently attributed to the purchase of food for himself, Williamson, or her children.

14

stores, respectively. In contrast, in October of 2011 Debtor spent "only" $440.86 at gas stations. Such wide swings in monthly fuel spending is unusual. The court is unable to make sense of these figures. While Debtor's bank and credit card statements show where Debtor spent his money, the court does not have a clear enough understanding of how the money was spent. Debtor's vague testimony that the spending was for general living expenses and opening Someplace New is insufficient. Substantial uncertainty remains surrounding Debtor's spending, and it is not the responsibility of the court or creditors to fill in the gaps. In re Juzwiak, 89 F.3d at 429. It is possible that Debtor does not know or has avoided knowing what happened. It is clear that the true explanation for Debtor's expenses is not what was given to the court, which remains baffled at several series of bizarre purchases.

Additionally, courts generally require sophisticated debtors running a business to be able to differentiate between business and personal expenses. Settembre v. Fidelity & Guar. Life Ins. Co., 2011 WL 1750295, at *2–3 (W.D. Ky. 2011); In re Trogdon, 111 B.R. at 659 (finding that when a sophisticated debtor with primarily consumer debts makes a significant business transaction, courts should "require recordation of some type as a requisite to obtaining discharge"). Debtor did not maintain separate records. While the court may make educated guesses regarding what purchases are business and which are personal, it is not the job of the court, trustee, or creditor to compile a Debtor's records. In re Wazeter, 209 B.R. at 227; In re Juzwiak, 89 F.3d at 429 ("[T]he burden is not on the creditor to organize and reconstruct the debtor's business affairs."). The court finds that a sophisticated Debtor running a business, even a small business such as Someplace New, is nevertheless under a duty to differentiate between business and personal expenses. This Debtor has failed to do. The court is satisfied Trustee has provided sufficient evidence stating a prima facie case against Debtor for a violation of § 727(a)(3). The burden shifts to Debtor to explain his failure to maintain adequate records.

Debtor's first argument is that he has provided adequate records, evidenced by the over four hundred pages of documents provided to Trustee. However, even voluminous records may be insufficient if they do not adequately explain a debtor's significant transactions. Gen. Elec. Capital Corp. v. Wickard (In re Wickard), 455 B.R. 628, 632 (Bankr. W.D. Mich. 2011); In re Ghere, 393 B.R. at 221. While Debtor has provided a large amount of documentation, the documentation does not adequately explain Debtor's cash expenses or unusual credit and debit card transactions. Debtor also argues that no debtor under the circumstances could provide more complete records, making Debtor's recordkeeping "justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The court does not agree. Debtor need not keep immaculate records, but instead must create and maintain as much information as a reasonable debtor with the same financial expertise. The court envisions a sliding scale with one end consisting of large businesses that must maintain in-depth records, and the other end consisting of unsophisticated consumer debtors requiring far less documentation. Debtor is sophisticated in financial matters and attempted to start a business in 2011, putting Debtor somewhere in the middle of the sliding scale. As such, Debtor's failure to produce evidence of significant cash withdrawals and failure to separate business and personal transactions is not justified under the facts of this case. While Debtor has provided testimony as to some of the uses of his cash withdrawals, "testimony is not a substitute for adequate documentation." Settembre, 2011 WL 1750295, at *3.

Debtor's final argument is that he has provided sufficient records for the majority of his

15

expenses. The court notes that Debtor spent $240,000.00 in 2011, and Debtor's information lists unexplained cash withdrawals of only $13,287.82. The actual amount of unexplained cash withdrawals is likely larger, based on inaccuracies in Debtor's information. While the percentage of a debtor's expenses without adequate support is relevant, the loss of significant assets requires accountability, even if the amount is immaterial. In Fidelity & Guaranty Life Ins. Co. v. Fioravante Settembre (In re Fioravante Settembre), 425 B.R. 423, 432 (Bankr. W.D. Ky. 2010), the court decided that a debtor's unexplained cash withdrawals of $24,000.00 was sufficient to deny discharge, even though the debtor's wealth made $24,000.00 immaterial. The court reasoned that even if a debtor is wealthy, "$24,000 remains a large amount that requires some accountability." Id. In the current case, even assuming that Debtor's cash withdrawal information is correct, Debtor has failed to account for $13,287.82 in cash withdrawals, or roughly 39% of his annual salary. In In re Trogdon, a court found that a debtor's unexplained expenses totaling 25% of his pre-tax income was sufficient to deny discharge. 111 B.R. at 659. The court holds that Debtor's failure to account for cash withdrawals approximating 39% of his income, and because $13,287.82 is a large amount requiring accountability, Debtor has failed to adequately justify his inadequate records. Trustee has satisfied all elements of § 727(a)(3) by a preponderance of the evidence. Debtor's discharge will be denied.

### C. Debtor's Discharge is Denied Under § 727(a)(5)

A denial of discharge under § 727(a)(5) is "closely aligned" with a denial under § 727(a)(3). In re Trogdon, 111 B.R. at 659. To deny discharge, Trustee must show that "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets." 11 U.S.C. § 727(a)(5). Section 727(a)(5) does not evaluate the culpability of the debtor's state of mind, but instead it is only interested in the adequacy of a debtor's explanation. Baker v. Reed (In re Reed), 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004). To state a case under § 727(a)(5), Trustee must show a loss or deficiency in prepetition assets, which is accomplished by showing that: "(1) the debtor had a cognizable ownership interest in a specific fund(s) or identifiable piece of property; and (2) that such an interest existed at a time not too far removed from when the petition was filed." Id. If Trustee is successful, the burden shifts to the debtor to come forward with evidence that satisfactorily explains the lost assets. Id.

In the current case, it is clear that Debtor had an ownership interest in the cash within his bank accounts, satisfying the first requirement. Debtor also obtained the funds in the year preceding bankruptcy, satisfying the second requirement. Id. (holding that receiving assets eighteen months before bankruptcy satisfies the "not too far removed" from the petition date requirement). Because Trustee adequately satisfied the first two requirements, Debtor must provide an explanation for the loss that is "reasonable under the circumstances." Id. A reasonable explanation, at the least, requires more than "vague or indefinite statements." Id. "An important component in ascertaining the reasonableness of any explanation is its capacity for verification; that is, is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency." Id. at 370.

As noted in the explanation of § 727(a)(3), Debtor made significant unverified cash withdrawals in 2011. Debtor's vague recollections and unconvincing documentary evidence is insufficient. See First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed), 700 F.2d 986 (5th Cir. 1983)

16

(holding that Debtor's explanation that $20,000.00 was consumed by living expenses and gambling losses was insufficient without documentation). For reasons similar to those outline in Debtor's violation of § 727(a)(3), Debtor has failed to satisfactorily explain his loss of assets. Debtor's discharge is denied under § 727(a)(5).

### III. Conclusion

For the reasons noted above, Trustee's Complaint to Deny Discharge of Thomas Roller is **GRANTED**. Debtor's discharge is denied under § 727(a)(3), (a)(4)(A), or (a)(5).

An order will be entered simultaneously with this opinion.

#     #     #

**Service List**:

**Daniel M McDermott**
Office of the United States Trustee
Howard M. Metzenbaum Federal Courthouse
201 Superior Ave. E. Suite 441
Cleveland, OH 44114

**Derrick Rippy ust11**
Office of the US Trustee
H. M. Metzenbaum U.S. Courthouse
201 Superior Avenue
Suite 441
Cleveland, OH 44114

**Thomas D Roller**
11 Vernon Rd
Shelby, OH 44875

**Charles T Robinson**
3 N Main St
Richland Bank Bldg
#400
Mansfield, OH 44902-1708